IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| IN THE MATTER OF )<br>THE COMPLAINT )<br> )<br>OF )<br> )<br>ATLANTIC MARINE PROPERTY )<br>HOLDING CO., INC., and  ATLANTIC )<br>MARINE, INC., Owners of the )<br>Barge, MOBILE HEAVY LIFTER; )<br>BENDER SHIPBUILDING & REPAIR CO., )<br>INC., Charterer and Disponent Owner of )<br>the Barge, MOBILE HEAVY LIFTER, )<br>ABS ID NO. 7700124, for exoneration from )<br>or limitation of liability. ) | CIVIL ACTION NO. 06-0100-CG-B |

## ORDER

This cause is before the court on the motion of Pemex Exploracion Y Produccion ("PEP") to exclude the expert testimony of Dr. Aaron Williams (Doc. 348), the motion of the State of Alabama, Department of Transportation; Alabama State Port Authority; Plains Marketing, LP; Arch Specialty Insurance Company and Interested Lloyds Underwriters; Company Market Participant, BP Products North America Inc.("the non-PEP claimants") to strike and exclude the testimony of Dr. Aaron Williams (Doc. 353)[1], opposition to the motions to exclude filed by Bender Shipbuilding & Repair Co., Inc.  ("Bender") (Doc. 378), the non-PEP claimants' reply (Doc. 391), and Bender's sur-reply (Doc. 413).  The court finds that Williams relied on sufficient data and facts, used reliable principals and methods, and applied the principles and methods reliably to the facts of the case to reach his conclusions.  Therefore, the motions to exclude his testimony are due to be denied.

---

[1] PEP also joins in the motion filed by the  non-PEP claimants. (Doc. 354).

**FACTS**

This lawsuit arises out of an incident involving a barge, the MOBILE HEAVY LIFTER ("MHL"), and the PSS CHEMUL, which was onboard the MHL when it broke loose from its moorings on August 29, 2005 during Hurricane Katrina.  The MHL and /or CHEMUL struck a ship and other structures and piers along the west bank of the Mobile River and became lodged beneath the Cochrane-Africatown Bridge.   Atlantic Marine, Inc., as the owner of the MHL, and Bender, as the alleged bareboat charterer of the MHL, seek exoneration from or limitation of liability in connection with the breakaway of the MHL and CHEMUL.  Several entities have filed claims for property damage allegedly resulting from the breakaway, including PEP as the owner of the PSS CHEMUL.

PEP and the non-PEP claimants move to exclude the testimony of Dr. Williams as unsubstantiated and unreliable.  Williams' report concludes that the strength of Hurricane Katrina "was much greater along the Mobile River than had been expected due to the development of a second, or outer eye wall."  (Williams Report p. 37).  "The outer eye wall was not apparent until after the storm was over and microwave satellite imagery was studied." (Id.). Williams' report also found that during Katrina, feeder bands of fast-moving thunderstorms produced a "collapsing core" that began to descend over Baldwin County and moved over Mobile Bay, reaching Shipyard 9, where the MHL was moored, at 8:11 a.m. CDT. (Id. at p. 17). Williams explains that a "collapsing core" frequently occurs in thunderstorms and is called a downburst or microburst. (Id. at 14).  When this occurs, "exceptionally cold air from aloft in the thunderstorm is brought downward to the surface by heavy rain" and "[t]he resulting wind gusts sometimes reach hurricane force." (Id. at 14).  "[T]his surge of subsiding air increases the

surface wind significantly and at times can double or more the existing surface wind velocity since the subsiding air often accelerates over the last 200 feet." (Id. at p. 15). Williams used several types of radar imagery to determine the wind speeds at Shipyard 9 during the hurricane. (Id. at p. 15). Williams states that Doppler velocity images cannot determine wind speed below 790 feet at Shipyard 9. (Id. at pp. 26, 34). Williams gives his opinion that a collapsing core reached Bender's Shipyard 9 with a wind speed of 145 mph at 790 feet. (Id. at 34). Williams further states the following:

> In fact, it is likely that the radar observed winds of 145 mph at 790 feet reached the surface of Shipyard 9 because of the rapid descent of the core at that site and the existence of wind shear immediately to the south of the yard. If the 145 mph wind did not descend, the surface winds could be determined using the NHC rule of 85 % of the wind occurring at 1,000 feet. However, the 145 mph wind was observed at a lower level than 1,000 feet. Therefore the surface wind was closer to 90% or 130.5 mph with even higher winds at the top of the 120-foot tall rig.

(Id. at p. 34). Williams also states that the 145 mph winds "could have easily been transferred to the surface in the form of a short-lived vortex" (tornado). (Id. at 36). Thus, Williams concludes that "[h]igh winds above the surface were transferred downward to Shipyard 9 in the range of 130.5-145 mph and possibly higher." (Id. at p. 37).

## LEGAL ANALYSIS

PEP and the non-PEP claimants[2] contend that Bender should be precluded from offering the expert testimony of Dr. Aaron Williams. Federal Rule of Evidence 702 provides for the admission of expert testimony when "scientific, technical, or other specialized knowledge will assist the trier of fact." The United States Supreme Court in Daubert v. Merrell Dow

---

[2] For simplicity, the court may refer to PEP and non-PEP claimants together as "movants."

Pharmaceuticals Inc., 509 U.S. 579 (1993) found that scientific expert testimony is admissible only if the proffered testimony is both relevant and reliable. "[A] district court judge is to act as a 'gatekeeper' for expert testimony, only admitting such testimony after receiving satisfactory evidence of its reliability." Dhillon v. Crown Controls Corporation, 269 F.3d 865, 869 (7th Cir. 2001); see also U.S. v. Majors, 196 F.3d 1206, 1215 (11th Cir. 1999). Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Accordingly, under Rule 702, "this Court has an obligation to screen expert testimony to ensure it stems from a reliable methodology, sufficient factual basis, and reliable application of the methodology to the facts" Whatley v. Merit Distribution Services, 166 F.Supp.2d 1350, 1353 (S.D. Ala. 2001) (citations omitted).

Expert testimony should not be excluded "on the ground that the court believes one version of the facts and not the other." Allstate Insurance Co. v. Hugh Cole Builder Inc., 137 F.Supp.2d 1283, 1285 (M.D. Ala. 2001). As the Allstate court stated:

> [T]he rejection of expert testimony is the exception rather than the rule. Daubert did not work a seachange over federal evidence law, and the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system. Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.

Id. at 1285-1286. To aid in determining reliability under Rule 702 this court looks to the non-exclusive factors set forth in Daubert:(1) whether the theory can be and has been tested; (2)

whether it has been subjected to peer review; (3) whether the theory has a high known or potential rate of error; and (4) whether the theory has attained general acceptance within the relevant scientific community.  Daubert, 509 U.S. at 593-94.  These four factors are not exhaustive, and the primary focus should be "solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595, 113 S.Ct. 2786.  "[T]he proponent of the testimony does not have the burden of proving that it is scientifically correct," but must establish "by a preponderance of the evidence, it is reliable." Allison v. McGhan Medical Corp., 184 F.3d 1300, 1312 (11th Cir. 1999) (citing In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 744 (3d Cir. 1994)) see also Whatley, 166 F.Supp.2d at1354 ("the proponent of the expert testimony has the burden to establish by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied.")(citations omitted).

In this case, the issue is whether Dr. Williams' testimony is reliable.  Williams' knowledge and education may be sufficient to qualify him to testify generally about meteorology, but the movants contend that his conclusions, particularly those regarding the wind speeds at Shipyard 9, are unreliable.  Movants first take aim at Williams' use of a computer model called the BLOHW Model.

The BLOHW Model is used to project the path of a hurricane. (Williams Depo. p. 38). The BLOHW Model is used principally by Dr. Blackwell and it is unknown what peer review it has received. (Williams Depo. pp. 44-45). Although "nudges" and adjustments are made to this computer program to manipulate the data, such adjustments were made by Dr. Blackwell, and Dr. Williams does not know how those are made.  Dr. Williams' knowledge of the BLOHW Model extends little beyond stating 1) that it projects the paths of hurricanes, 2) who designed it,

3) who operates it, and 4) where it is used. (Williams Depo. pp. 37, 39, 69, 243).  However, although there is significant testimony regarding the BLOHW Model, it does not appear to be the basis for any of Williams' opinions on wind speeds.  The BLOHW Model is only used to forecast the projected path of a hurricane and has not been offered as support for Williams' conclusion that wind speeds at Shipyard 9 were in the range of 130.5-145 mph and possibly higher.  Moreover, any testimony regarding the path predicted by the BLOHW Model would not be offered to show its accuracy.  The paths predicted by the BLOHW Model and various other models would only show what those who received reports based on those models would have expected from Hurricane Katrina.

Movants next argue that Williams' "collapsing core" phenomenon is an untested hypothesis based on inadequate data.   Bender, on the other hand, argues that a "collapsing core" is nothing new and is widely recognized in meteorology.  The court agrees that Williams' report and other testimony submitted indicates that it is simply another name for a downburst or microburst that occurs during a hurricane.  For instance, PEP's expert testified as follows:

> Collapsing core is a name.  And that phenomenon has been known for at least a half a century.  It's called by different names: Microbursts, downbursts, gustfronts, many different names.  But they're all the same thing.  This is just a name, another name for the same kind of phenomenon.  So I have been very well aware of this sort of thing for most of my career.

(Mitchell Depo. p. 119).  Thus, the court does not find the Williams' use of "collapsing core" phenomenon makes his report unreliable.

Movants object to Williams' use of unknown calculations to determine correction factors.  However, as Bender points out, the formula used to calculate the corrections is widely recognized as standard in the meteorological community and was provided as an exhibit to

Williams' affidavit.

Movants also object to Williams' reliance on coordinates provided by Bender for the location of Shipyard 9 without personally verifying the accuracy of the coordinates. However, there appears to be no dispute that the coordinates were accurate. Thus, Williams' use of the coordinates did not make his conclusions unreliable.

The issue of greatest concern to the court is the fact that no radar data below 790 feet is available for the location in question. Movants argue that Williams' conclusions regarding surface wind speeds are unreliable because they are based on Doppler Radar data collected above 790 feet. However, as stated above, Bender does not have to demonstrate that Williams' conclusion is scientifically correct. Bender must only establish, by a preponderance of the evidence, that it is reliable. The court notes that Williams did not base his opinion solely on the data available at the exact time and place the alleged collapsing core hit Shipyard 9. Williams observed the alleged collapsing core phenomenon beginning in Baldwin County at 7:55 a.m. CDT and followed the indicators as they moved across Mobile Bay until it reached Shipyard 9 at 8:11 a.m. CDT. (See Williams Depo. pp. 73-74 "watching it and projecting it and watching the angle at which it is dropping and the rate at which it's dropping, it was very reasonable and obvious to us that at least part of that made it down to the surface" and Williams Report p. 17). The court also notes that Williams' conclusion is not stated in definitive terms. Williams qualifies his opinion by stating only that it is likely that a collapsing core descended to the surface at Shipyard 9 and he admits that "[a]s long as we don't have data down at the surface, we can never say precisely on the basis of surface data that that occurred." (Williams Depo. p. 211). Movants argue that the lack of certainty makes Williams' opinions unreliable and that they are

merely the *ipse dixit* of the expert since there is too great an analytical gap between the data and Williams' conclusions.  However, Williams' testimony and conclusions acknowledge the gap in data and take into account the shortcomings of the data by computing a range rather than a precise wind speed.  Williams' conclusions are not based merely on his belief that the collapsing core descended to the surface.  Williams' finding that high winds at the surface of Shipyard 9 were in the range of "130.5-145 mph and possibly higher" is based on the conclusion of the likelihood that a collapsing core reached the surface, but includes the possibility that it did not reach the surface.   The low end of 130.5 mph was calculated based on the possibility that the collapsing core did <u>not</u> reach the surface.  Bender argues that this lower wind speed was calculated using a well-recognized and accepted National Hurricane Center formula and movants have not shown otherwise.  Thus, the court finds that Williams' testimony is based on sufficient data. The court also finds that Williams used reliable principles and methods and applied the principles and methods reliably to the facts of the case to reach his conclusions.

## CONCLUSION

For the reasons stated above, the motions of PEP and the non-PEP claimaints to exclude the testimony of Dr. Aaron Williams (Docs. 348, 353) are **DENIED**.

**DONE and ORDERED** this 11th day of August, 2008.

/s/ Callie V. S. Granade
CHIEF UNITED STATES DISTRICT JUDGE