IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| IN THE MATTER OF ) | |
| THE COMPLAINT ) | |
| ) | |
| OF ) | |
| ) | |
| ATLANTIC MARINE, PROPERTY ) | |
| HOLDING CO., INC., and ATLANTIC ) | |
| MARINE, INC., Owners of the ) | CIVIL ACTION NO. 06-0100-CG-B |
| Barge, MOBILE HEAVY LIFTER; ) | |
| BENDER SHIPBUILDING & REPAIR CO., ) | |
| INC., Charterer and Disponent Owner of ) | |
| the Barge, MOBILE HEAVY LIFTER, ) | |
| ABS ID NO. 7700124, for exoneration from ) | |
| or limitation of liability. ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the court on the motion of Atlantic Marine, Inc., for summary judgment (Doc. 351), opposition filed by State of Alabama Department of Transportation, Alabama State Port Authority, Plains Marketing, Inc., Arch Specialty Insurance Company and Interested Lloyds Underwriters, BP Products North America Inc., ("non-PEP claimants") (Doc. 379), opposition filed by Pemex Exploracion y Produccion ("PEP") (Doc. 383), and Atlantic Marine's reply (Doc. 407). For the reasons discussed below, the court finds that the motion is due to be denied.

## FACTS

This lawsuit arises out of the incident in which the barge MOBILE HEAVY LIFTER ("MHL"), and the PSS CHEMUL which was onboard the MHL, broke loose from their moorings on August 29, 2005 during Hurricane Katrina. The MHL and /or CHEMUL struck a ship and other structures and piers along the west bank of the Mobile River and became lodged beneath

the Cochrane-Africatown Bridge.  Atlantic Marine, Inc., as the owner of the MHL, and Bender Shipbuilding & Repair Company, Inc. ("Bender"), as the alleged bareboat charterer of the MHL, filed this action seeking exoneration from or limitation of liability in connection with the breakaway of the MHL and CHEMUL.  Several entities have filed claims for property damage allegedly resulting from the breakaway.

PEP, the owner of the PSS CHEMUL contracted with Bender to perform certain repairs and renovations of the CHEMUL. (Scheib Depo. pp. 205-206).  Bender entered into a charter agreement with Atlantic Marine for the use of the MHL for the purpose of drydocking the CHEMUL while repairs were performed. (Scheib Depo. p. 399).  The MHL has a series of compartments throughout its hull, and water can be let in or blown out of these compartments using a system of hydraulically controlled valves. (James Depo. p. 16; Roberts Depo. p. 24). This system enables the barge to be ballasted down so that it is almost completely submerged. With its deck submerged, large structures such as the CHEMUL can be floated over the barge and then lifted out of the water as the MHL is raised back to the surface.

The charter agreement between Bender and Atlantic Marine states that Atlantic Marine would dock the CHEMUL on the MHL in Atlantic Marine's shipyard.  Upon completion of such docking by Atlantic Marine, Bender was to shift the MHL to its berthing location at Yard Number 9.  The agreement states that the MHL "is not to be used for any purpose except the docking of the CHEMUL." At the end of the charter, Atlantic Marine was to undock the CHEMUL in Atlantic Marine's shipyard.  The charter agreement also provided that Atlantic Marine was to be given access to the MHL "to inspect its condition and monitor Bender's activities."  The charter agreement stated that if Atlantic Marine reasonably believes Bender's

use of the MHL is unsafe at any time, and if such claimed unsafe condition continued for three days, Atlantic Marine could terminate the charter and take possession of the MHL upon written notice to Bender.

Once a day, Atlantic Marine sent a member of its dockwatch crew to Bender's Yard 9 to check the draft of the MHL. (Roberts Depo. p. 22). Atlantic Marine would "take the drafts at all four corners, which would tell us if we were having a problem with the vessel sinking and then they would check the physical integrity of the hydraulic system, the air system and the control system." (Id.). Atlantic Marine checked the drafts because it was in Atlantic Marine's best interest since Atlantic Marine was the "operator" - Atlantic Marine "operated the [MHL] when Bender wanted it operated." (Id. at p. 23). Atlantic Marine checked the drafts to watch for tank leakage and to adjust the tank levels to accommodate changes in the weight or the balance of the weight of the MHL. (Kramer Depo. p. 49). When needed, Atlantic Marine's assistant dockmaster and an operator would open or close the MHL's hydraulically-controlled tank valves to add water to or blow water out of the MHL's tanks. (Kramer Depo. p. 49). Bender was prohibited from operating the MHL itself, and any adjustments to the MHL were done by Atlantic Marine. (Cramer Depo. pp. 50-51; Roberts Depo. p. 42).

When Hurricane Ivan made landfall in September 2004, the CHEMUL was not yet loaded on the MHL. Bender's project manager at that time, Greg Castleman, decided to submerge the CHEMUL to the floor of the Mobile River in preparation for the storm. (Castleman Depo. pp. 16, 33-34). They experienced no difficulties in submerging the CHEMUL. (Castleman Depo. p. 34).

In early July 2005, after the CHEMUL had been loaded on the MHL, Tropical Storm

3

Cindy approached Mobile. The MHL and CHEMUL were not submerged in preparation for Cindy and remained moored in the shipyard. The MHL and CHEMUL suffered no damage, but after viewing the MHL "bouncing around" during the storm, some were concerned that the MHL and CHEMUL would not be safe, as moored at that time, against winds of more than 70 mph. (Cramer Depo. p. 29; E-mail - July 6, 2005 from Cramer to Teun).

The next storm to approach was Hurricane Dennis. On July 9, 2005, in preparation for Dennis, the MHL and CHEMUL were submerged by Atlantic Marine with the assistance of Dutch engineers. (James Depo. pp. 27-28; Saucier Depo. I pp. 77-78). Although Atlantic Marine performed the submersion, it was reportedly Bender that made the decision to submerge and that paid Atlantic Marine's expenses for accomplishing that feat. (Knepton Depo. p. 26, 29).

Hurricane Katrina entered the Gulf in late August 2005. On Thursday morning, August, 25, 2005 Hurricane Katrina was projected to hit the panhandle of Florida. (Barnes Depo. p. 176). On Friday afternoon, Katrina's projected path moved significantly westward and it appeared to be heading for Mobile. (Barnes Depo. pp. 175-177). On Friday night and Saturday morning, the forecast track of Katrina moved further west near the Mississippi/Louisiana border. (Barnes Depo. p. 177). On Saturday, the local National Weather Center forecast that Mobile would experience southeast winds of 35 knots (40 mph) with frequent gusts to 45 knots. (Mitchell Depo. pp. 103).

On Friday, when Katrina appeared to be heading towards Mobile, Bender considered its options such as whether they could submerge the MHL and whether the moorings could be increased in strength. (Scheib Depo. pp. 246, 311). Atlantic Marine's dockmaster, Jeff Roberts, reported that he spoke with Tim Scheib, Bender's Chief Operating Officer and conveyed to

Scheib that the Dutch engineers who had assisted in submerging the rig previously could not make it to Mobile in time to submerge the MHL before Katrina hit, but that Atlantic Marine personnel were capable of submerging it safely on their own. (Roberts Depo. p. 19). According to Roberts, Scheib said he would get back to him, and on Saturday morning when Scheib called, he said Bender had decided not to submerge the MHL. (Roberts Depo. pp. 19-20). Scheib recollects the conversation differently. According to Scheib, Roberts said it was unlikely that they could sink the barge at that time because the Dutch engineers could not get there in time. (Scheib Depo. pp. 17, 26).

Bender added additional lines to the MHL and made other preparations to secure loose materials etc. (Scheib Depo. p. 250). Bender also contracted with Sea Bulk Towing to station a tug by the MHL and assist in keeping it secure (Scheib Depo. pp. 54, 152). Between 8:00 and 8:15 a.m., the tug captain decided it was unsafe to stay in place because of flying debris and the tug left the MHL. (Busby Depo. pp. 46-50). The MHL, with the CHEMUL on board, broke loose from its moorings around 8:30 a.m. Monday morning. (Scheib Depo. p. 159).

## LEGAL ANALYSIS

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted: "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a

genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" Bailey v. Allgas, Inc., 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting Anderson, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, at 249-250. (internal citations omitted).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." See Anderson, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001).  In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir.1999).  "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992) (citing Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 524 (11th Cir.1994)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)).  Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment."  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  The non-moving party "may not rest on the mere allegations or denials of the [non-moving] party's pleading, but .... must set forth specific facts showing that there is a

genuine issue for trial." FED. R. CIV. P. 56(e)  "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 at 587 (1986) (internal quotation and citation omitted).

### B. Discussion

Atlantic Marine, Inc. contends that it did not actively participate in either the decisions concerning preparations or the actual preparations of the MHL and CHEMUL for Hurricane Katrina.  In Atlantic Marine's view, it had no responsibility for the MHL or CHEMUL with regard to the hurricane and has not been shown to have been at fault in any way for the breakaway and resulting damages.  PEP and the non-PEP claimants, on the other hand, contend that Atlantic Marine did not give up full custody and control of the MHL and that therefore, under the Louisiana rule, it is presumed to be at fault as the owner of a drifting vessel that allided with stationary objects.

Under the Louisiana rule, when an unmoored, drifting vessel hits an anchored vessel or a structure, it is presumed to be at fault.  See The LOUISIANA, 3 Wall. 164 (70 U.S.), 18 L.Ed. 85 (1865). This presumption is rebuttable through any one of three ways.

> The defendant can demonstrate: "[1] that the allision was the fault of the stationary object[;] [2] that the moving vessel acted with reasonable care[;] or [3] that the allision was an unavoidable accident." [Bunge Corp v.]Freeport Marine Repair, 240 F.3d [919] at 923 [11th Cir. 2001].These three defenses might be analogized to the common law tort arguments of contributory negligence, denial of negligence, and superceding causation, respectively. Each independent argument, if sustained, is sufficient to defeat liability.

Fischer v. S/Y NERAIDA, 508 F.3d 586, 593 (11th Cir. 2007).  There is no dispute that the

stationary objects in this case were not at fault. However, the parties dispute whether Atlantic Marine had the duty of care, whether reasonable care was taken, and whether the incident was unavoidable.

Atlantic Marine contends that the presumption is rebutted as to the vessel owner here because Atlantic Marine had transferred the care and custody of the vessel to Bender. In support of its position, Atlantic Marine cites Compania de Navigacion Porto Ronco, S.A. v. S/S AMERICAN ORIOLE, 585 F.2d 1326, 1326 (5th Cir. 1978) which affirmed the Eastern District of Louisiana's decision of Compania de Navigacion Porto Ronco, S. A. v. S/S AMERICAN ORIOLE, 474 F. Supp. 22 (E. D. La.1976). In AMERICAN ORIOLE, the vessel at issue was placed in drydock at Todd Shipyard in November 1974 to undergo repairs and other work and thereafter was to lay-up as a dead ship for an indeterminate period. Id. at 23. On December 4, 1974, the vessel was taken out of dry dock by Todd's docking master and was secured at Todd's Lower Navy Berth No. 4. Id. at 24. The captain of the vessel remained aboard during the tie-up, but the vessel was without power and was otherwise unmanned. Id. The captain checked the arrangement and alignment of the lines and suggested to the Todd docking master that additional lines be put out in the future for the vessel's long lay-up. Id. Two additional lines were added. Id. Repairs continued and Todd Shipyard provided and charged for line handlers to adjust and put out mooring lines as necessary and daily fire watch service whose duties included checking all mooring lines. Id. On January 10, 1975, severe weather reports were issued for the area which forecast heavy rain, possible hail and gusty winds and stated that some of the thunderstorms would be accompanied by wind gusts nearing 70 mph and a possible tornado. Id. Todd's management instructed its foreman to check the vessel and put out additional lines as necessary. Id. Later that day, the vessel's lines snapped and the vessel drifted downriver, striking several other ships before tugs arrived to secure the vessel. Id. The court stated that "[a]s a wharfinger entrusted with sole and exclusive custody and control of the unmanned, dead ship American Oriole, defendant, Todd Shipyard, was a bailee for hire." Id. at 27. As such,

"Todd Shipyard was under a duty to exercise reasonable diligence in ascertaining the condition of the vessel's berth and in properly and securely mooring her." Id.  The court found further that because "[h]er owners surrendered [the vessel] to the care and custody of defendant Todd Shipyard fully one month prior to her breakaway," they could not be held responsible for the shipyard's failure to take adequate mooring precautions. Id.  The evidence of the case rebutted the presumption of fault of the vessel. Id.  The court found that Todd Shipyard, as the sole custodian of the vessel at the time of her breakaway, was solely at fault in the casualty. Id.

      The parties in this case dispute the meaning of the word "fully" as used in the statement from AMERICAN ORIOLE quoted above: "[h]er owners had surrendered the vessel to the care and custody of defendant Todd Shipyard fully one month prior to her breakaway."  Atlantic Marine contends that "fully" describes "one month" and not the extent of the surrender of custody and care.  However, regardless what is meant by "fully" in that particular sentence, it is clear that the custody and care had in fact been fully (completely) surrendered at the time of the incident since Todd Shipyard was found to be the sole custodian.  Although the captain had stayed onboard when the vessel was brought out of drydock and had checked and made suggestions concerning the vessel's mooring, there was no evidence that the owners or crew checked or assisted with the care or security of the vessel after that time.  Todd Shipyard maintained and adjusted the vessel's moorings, apparently without any assistance of the owner or its crew, for more than a month before the severe whether struck.  There is no indication that the owner of the vessel had any contact with the vessel or Todd Shipyard regarding the vessel during that time, other than to be charged for work and maintenance of the vessel.

      In the instant case, Atlantic Marine did not transfer complete custody and care of the MHL to Bender.  Although it is questionable whether merely having the right to inspect the MHL would constitute a retention of custody and care, it is clear that Atlantic Marine did more than that here.  Atlantic Marine monitored the MHL daily and made adjustments to the drafts whenever it deemed appropriate.  Atlantic Marine was by all accounts the "operator" of the

MHL. Bender was, in fact, prohibited from operating the MHL itself. Whether the vessel should and could be submerged was an issue of great importance in the preparation of the vessel for Hurricane Katrina, and is a disputed issue in this case. Submersion of the MHL could not have been accomplished without Atlantic Marine's participation, and arguably required advance preparation by Atlantic Marine to see that the necessary experts were available to assist in accomplishing that task. There is evidence that Atlantic Marine was capable of submerging the MHL without any additional assistance, but there is also evidence that Atlantic Marine told Bender that it could not be submerged, thus forcing Bender to rely on other options. Looking at the facts in the light most favorable to the non-moving party, the court finds that Atlantic Marine was charged with some of the care and maintenance of the MHL and that how it carried out its duty of care played a role in the preparation of the MHL for Hurricane Katrina.

Atlantic Marine also argues that the preparations made for Hurricane Katrina were reasonable under the circumstances. "Applied to the context of hurricane preparations, reasonable care amounts to whether the owner 'use[d] all reasonable means and took proper action to guard against, prevent or mitigate the dangers posed by the hurricane.'" Fischer, 508 F.3d at 594 (quoting Stuart Cay Marina v. M/V Special Delivery, 510 F.Supp.2d 1063, 1072 (S.D. Fla. 2007)). "Although what 'reasonable care' requires changes with the circumstances, that standard recognizes the existence in every case of something more that could be done--and perhaps would be legally required under a 'highest degree of caution' standard--but that reasonable care does not demand." Id.

> The appropriate standard of care in this regime is based upon (1) general concepts of prudent seamanship and reasonable care; (2) statutory and regulatory rules ...; and (3) recognized customs and usages.

Id. (citation and internal quotations omitted).

Numerous experts and fact witnesses have given evidence about what preparations would have adequately protected the MHL and CHEMUL during Hurricane Katrina and about the preparations that actually were made for Katrina. There is also considerable testimony about the

10

conditions that were expected from Katrina and the conditions actually experienced at Shipyard 9 from Katrina.  As might be expected, there is no consensus among the witnesses as to what preparations were appropriate under the circumstances or even as to what circumstances existed.  For instance,  there is testimony that the MHL would have been protected if it had been submerged and that submerging such vessels is the standard practice for at least one other company. (See e.g. Castleman Depo. p. 13 ("That was standard procedure with my previous employer...")).  There is also testimony that submerging the MHL with the CHEMUL onboard during Katrina would have resulted in a similar fate to what actually occurred because the storm surge from Katrina would have made the CHEMUL float and breakaway by itself. (Upson Report, p. 5; Upson Depo. Pp. 34-35).  There is testimony that other rigs in the same area, and in areas closer to the eye wall of the hurricane, were submerged and did not break loose. (See e.g. Carey Depo. p. 115).  There is testimony that if the MHL had been moored correctly that it would have been able to withstand winds of 70-75 and even 120 mph. (See e.g. Kastner Depo. at 45; Scruton Depo. p. 91; Reay Depo. p. 223).  There is also testimony that the winds experienced at Shipyard 9 were significantly greater than at other areas in Mobile – even as high as 145 mph. (See Williams Depo. and Report).  There is clearly no agreement as to what preparations would have protected the MHL and CHEMUL from breaking away, much less what should "reasonably" have been done to protect the MHL and the CHEMUL. The only clear fact is that the preparations actually made were insufficient since the moorings failed.  Viewing the testimony in the light most favorable to non-movants, the court finds that there is a genuine issue of material fact as to whether the preparations were reasonable under the circumstances.

     Atlantic Marine argues that, regardless of the reasonableness of the preparations, unforeseen intervening acts caused the incident.  Atlantic Marine contends that the evidence indicates that, if properly done, the moorings should have held under the expected winds from Katrina.  Therefore, Atlantic Marine argues that either Bender was negligent in preparing the moorings or that unexpected conditions occurred which constitute an act of God or force

11

majeure. Atlantic Marine contends that if the winds during Hurricane Katrina were in the expected range of 70-75 mph, the mooring lines must have been improper. Atlantic Marine argues that it had no responsibility for or involvement with the mooring of the barge and that it could not have reasonably foreseen that Bender would have negligently maintained the moorings. If, in fact, the winds reached as high as 140 mph, as one expert has opined, then Atlantic Marine contends it was an unforeseeable act of God which caused the breakaway. The act of God or intervening act defense denies that a party's acts or omissions, even if they fail to meet the standard of reasonable care under the circumstances, caused the accident. See Warrior & Gulf Navigation Co. v. United States, 864 F.2d 1550, 1553 (11th Cir.1989) ("A party may be deemed negligent yet still be exonerated from liability [i]f the act of God would have produced the same damage irrespective of the party's negligence.").

> For the subsequent negligence of the third party to absolve the initial wrongdoer of liability for all of the damages suffered by the injured party, the subsequent negligence of the third party must be so extraordinary that a reasonably prudent person could not have foreseen its occurrence.

Miss Janel, Inc. v. Elevating Boats, Inc., 725 F.Supp. 1553, 1569 (S.D. Ala. 1989).

In the instant case, it is not clear that Bender's alleged negligence was so extraordinary as to be unforeseeable. The court notes that during a previous hurricane, Atlantic Marine's Assistant Dockmaster had noticed the MHL bouncing around during the storm and expressed concern that it would not be safe in winds of more than 70 mph. There is evidence that the lines had not been properly maintained prior to Katrina. Although additional lines were added, if Atlantic Marine had reason to know of these previous problems it would seem foreseeable that the lines would be negligently maintained again. Atlantic Marine knew there was a question concerning how the MHL should be kept safe during Hurricane Katrina and apparently did nothing to check on the MHL or otherwise ensure that Bender had properly secured the MHL. Looking at the facts in the light most favorable to the non-movants, the court finds that Bender's alleged negligence was not so extraordinary as to be unforeseeable.

Atlantic Marine does not contend that there is sufficient evidence for this court to

conclude on summary judgment that the winds actually reached 130.5-145 mph as suggested by Dr. Williams.  Even if that were the case, the court finds it questionable whether such circumstances would be unforeseeable.  It is common knowledge that hurricanes are not completely predictable, a fact which is demonstrated by the hurricanes that have been briefly discussed here.  Atlantic Marine's rationalization that it was reasonable to prepare for the hurricane only as precisely forecast is not reasonable.  The forecast for Katrina changed significantly each day.  With a category 4 hurricane heading towards the Gulf Coast, the court finds that, viewing the evidence in the light most favorable to the non-movants, it was foreseeable that the winds might significantly exceed 75 mph.

## CONCLUSION

For the reasons stated above, the motion of Atlantic Marine Inc., for summary judgment (Doc. 351) is **DENIED.**

**DONE** and **ORDERED** this 11th day of August, 2008.

  /s/ Callie V. S. Granade  
CHIEF UNITED STATES DISTRICT JUDGE