**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **IN THE MATTER OF THE COMPLAINT OF ATLANTIC MARINE, PROPERTY HOLDING CO., INC., and ATLANTIC MARINE, INC., Owners of the Barge, MOBILE HEAVY LIFTER; BENDER SHIPBUILDING & REPAIR CO., INC., Charterer and Disponent Owner of the Barge, MOBILE HEAVY LIFTER, ABS ID NO. 7700124, for exoneration from or limitation of liability.** | ) | **CIVIL ACTION NO. 06-0100-CG-B** |

**MEMORANDUM OPINION AND ORDER**

This matter is before the court on the motion of claimants: Alabama State Port Authority and Arch Specialty Insurance Company, Plains Marketing, Inc., BP North America Inc., and the Alabama Department of Transportation (collectively "non-PEP claimants") for partial summary judgment (Doc. 355), joinder in the motion by Pemex Exploracion y Produccion ("PEP") (Doc. 356), objection to PEP's joinder filed by Bender Shipbuilding & Repair Co. ("Bender") (Doc. 380), Bender's response in opposition to the motion for summary judgment (Doc. 385), the non-PEP claimants' reply (Doc. 405), and Bender's sur-reply (Doc. 418). For the reasons discussed below, the court finds that claimants' motion for partial summary judgment is due to be denied.

**FACTS**

This lawsuit arises out of the incident in which the barge MOBILE HEAVY LIFTER ("MHL"), and the PSS CHEMUL which was onboard the MHL, broke loose from their moorings

on August 29, 2005 during Hurricane Katrina. The MHL and /or CHEMUL struck a ship and other structures and piers along the west bank of the Mobile River and became lodged beneath the Cochrane-Africatown Bridge. Atlantic Marine, Inc., as the owner of the MHL, and Bender Shipbuilding & Repair Company, Inc. ("Bender"), as the alleged bareboat charterer of the MHL, filed this action seeking exoneration from or limitation of liability in connection with the breakaway of the MHL and CHEMUL. Several entities have filed claims for property damage allegedly resulting from the breakaway.

PEP, as the owner of the PSS CHEMUL, contracted with Bender to perform certain repairs and renovations of the CHEMUL. (Scheib Depo. pp. 205-206). Bender entered into a charter agreement with Atlantic Marine for the use of the MHL for the purpose of drydocking the CHEMUL while repairs were performed. (Scheib Depo. p. 399). The MHL has a series of compartments throughout its hull, and water can be let in or blown out of these compartments using a system of hydraulicly controlled valves. (James Depo. p. 16-17; Roberts Depo. p. 24). This system enables the barge to be ballasted down so that it is almost completely submerged. With its deck submerged, large structures such as the CHEMUL can be floated over the barge and then lifted out of the water as the MHL is raised back to the surface.

The charter agreement between Bender and Atlantic Marine states that Atlantic Marine would dock the CHEMUL on the MHL in Atlantic Marine's shipyard. Upon completion of such docking by Atlantic Marine, Bender was to shift the MHL to its berthing location at Yard Number 9. The agreement states that the MHL "is not to be used for any purpose except the docking of the CHEMUL." At the end of the charter, Atlantic Marine was to undock the CHEMUL in Atlantic Marine's shipyard. The charter agreement also provided that Atlantic

Marine was to be given access to the MHL "to inspect its condition and monitor Bender's activities." The charter agreement stated that if Atlantic Marine reasonably believes Bender's use of the MHL is unsafe at any time, and if such claimed unsafe condition continued for three days, Atlantic Marine could terminate the charter and take possession of the MHL upon written notice to Bender.

Once a day, Atlantic Marine sent a member of its dockwatch crew to Bender's Yard 9 to check the draft of the MHL. (Roberts Depo. p. 22). Atlantic Marine would "take the drafts at all four corners, which would tell us if we were having a problem with the vessel sinking and then they would check the physical integrity of the hydraulic system, the air system and the control system." (Id.). Atlantic Marine checked the drafts because it was in Atlantic Marine's best interest since Atlantic Marine was the "operator" - Atlantic Marine "operated the [MHL] when Bender wanted it operated." (Id. at p. 23). Atlantic Marine checked the drafts to watch for tank leakage and to adjust the tank levels to accommodate changes in the weight or the balance of the weight of the MHL. (Kramer Depo. p. 49). When needed, Atlantic Marine's assistant dockmaster and an operator would open or close the MHL's hydraulically-controlled tank valves to add water to or blow water out of the MHL's tanks. (Kramer Depo. p. 49). Bender was prohibited from operating the MHL itself, any adjustments to the MHL were done by Atlantic Marine. (Cramer Depo. pp. 50-51; Roberts Depo. p. 42).

When Hurricane Ivan made landfall in September 2004, the CHEMUL was not yet loaded on the MHL. (Burgamy Depo. p. 116; Scheib Depo. pp. 20, 177; Holley Depo. p. 21). Bender's project manager at that time, Greg Castleman, decided to submerge the CHEMUL to the floor of the Mobile River in preparation for the storm. (Castleman Depo. pp. 16, 33-34).

Castleman states that submerging was standard procedure with his previous employer, Noble Drilling - "[a]nytime a hurricane would come, they would put them on the – bottom of the river." They experienced no difficulties in submerging the CHEMUL. (Castleman Depo. p. 34).

In early July 2005, after the CHEMUL had been loaded on the MHL, Tropical Storm Cindy approached Mobile. The MHL and CHEMUL were not submerged in preparation for the storm and remained moored in the shipyard. The MHL and CHEMUL suffered no damage, but after viewing the MHL "bouncing around" during the storm, there was concern that the MHL and CHEMUL would not be safe as moored at that time against winds of more than 70 mph. (Cramer Depo. p. 29; Email - July 6, 2005 from Cramer to Teun Hoogeven).

The next storm to approach was Hurricane Dennis. On July 9, 2005, in preparation for Dennis, the MHL and CHEMUL were submerged by Atlantic Marine with the assistance of Dutch engineers. (James Depo. pp. 27-28; Saucier Depo. I pp. 77-78). Although Atlantic Marine performed the submersion, it was reportedly Bender that made the decision to submerge and that paid Atlantic Marine's expenses for accomplishing that feat. (Knepton Depo. p. 26, 29). Neither the MHL nor the CHEMUL sustained damage. (James Depo. pp. 27-28; Saucier Depo. I pp. 77-78).

Hurricane Katrina approached the Gulf in late August 2005. On Wednesday, August 24, 2005 (5 days before Katrina hit), the Coastal Weather Research Center, which Bender subscribed to, said that Tropical Storm Katrina was likely to become a hurricane with landfall projected for August 29 or 30 between Morgan City, LA., and Tallahassee, FL. That same day, the Coast Guard issued a marine safety information bulletin which stated that Katrina "has the distinct potential to move into the Gulf of Mexico over the weekend and potentially affect Sector

Mobile's AOR." (Doc. 355, Ex. XX). The bulletin stated that "[s]hould Topical Storm Katrina enter the Gulf of Mexico, mariners are advised of possible closings of ports and waterways within the Sector Mobile AOR beginning early next week." (Id.). On Thursday morning, August, 25, 2005, Hurricane Katrina was projected to hit the panhandle of Florida. with Mobile Bay at the edge of the 1 to 3 day potential track. (Barnes Depo. p. 176). Katrina had reached hurricane strength and the Coastal Weather Center reported that there was a possibility it would become a major hurricane. On Friday, August 26, 2005, the Coast Guard reported that gale force to hurricane force winds are expected to affect the ports of Mobile, Pensacola, and Panama City. The Coast Guard also ordered that:

> Vessels desiring to remain in port must submit a written request to the COTP [Captain of the Port] along with a mooring plan within 12 hours following the release of this MSIB [Marine Safety Information Bulletin]. The request may be faxed to Sector Mobile at (251) 441-6169. Upon receipt of written request and approval, the COTP will issue a letter of approval to the vessel's owner and agent. This includes vessels in lay up status.

(Doc. 355, Ex. BBB). On Friday afternoon, Katrina's projected path moved significantly westward and it appeared to be heading for Mobile. (Barnes Depo. pp. 175-177). On Friday night and Saturday morning, the forecast track of Katrina moved further west near the Mississippi/Louisiana border. (Barnes Depo. p. 177). On Saturday, the local National Weather Center forecast that Mobile would experience southeast winds of 35 knots (40 mph) with frequent gusts to 45 knots. (Mitchell Depo. pp. 103).

On Friday, when Katrina appeared to be heading towards Mobile, Bender considered its options such as whether they could submerge the MHL and whether the moorings could be increased in strength. (Scheib Depo. pp. 246, 311). Atlantic Marine's dockmaster, Jeff Roberts, reports that he spoke with Tim Scheib, Bender's Chief Operating Officer, and conveyed to

Scheib that the Dutch engineers who had assisted in submerging the rig before could not make it in time to submerge the MHL before Katrina hit, but that Atlantic Marine personnel were capable of submerging it safely on their own. (Roberts Depo. p. 19). According to Roberts, Scheib said he would get back to him, and on Saturday morning when Scheib called, he said Bender had decided not to submerge the MHL. (Roberts Depo. pp. 19-20). Scheib recollects the conversation differently. According to Scheib, Roberts said it was unlikely that they could sink the barge at that time because the Dutch engineers could not get there in time. (Scheib Depo. pp. 17, 26).

Beginning Friday evening, Bender began removing equipment off the MHL. (Saucier Depo., Vol. I, p. 113). Weibel testified that he prepared, but did not print, calculations based on 120 mile per hour winds. (Weibel Depo. Vol. I, pp. 23-24).

On Saturday, August 27, 2005, Katrina was reported to pose an extreme risk from Southeast Louisiana to Southwest Alabama and forecasts reported that any of these locations may receive a direct hit. The Coast Guard Marine Safety Information Bulletin 22-05, issued on August 27, 2005, stated that Katrina was now predicted to enter the Captain of the Port Mobile Area of Responsibility anywhere from Southwest Louisiana to Fort Walton Beach, FL., as early as 2:00 p.m. Monday, August 29, 2005. (Doc. 355, Ex. DDD). The Coast Guard issued its 48 hour alert which stated that "[o]cean going ships and ocean going CG regulated barges greater than 200 GT not approved to remain in port must depart beyond the sea buoy ... no later than Sunday 2:00 p.m., August 28, 2005." (Id.).

On Sunday morning, August 28, 2005, Bender held a meeting to talk about the contingency plan. At 3:05 p.m., Coastal Weather Research Center reported that Katrina was the

most powerful storm to ever be recorded in the northern Gulf of Mexico. (Doc. 355, Ex. EE p. 43). Katrina was reported to be a very large storm with widespread effects and the range of Katrina's projected landfall was as far west as New Orleans, LA., and as far east as Pascagoula, MS. (Id.). The report noted that the storm could "wobble" close to the time of landfall, as Hurricane Ivan had done, and that the storm could hit farther east along the Mississippi coast or could make a direct strike on New Orleans before turning northeastward.. (Id.). The report stated that those areas hit with the 60 mile wide eyewall would experience at least category 3 wind conditions, with category 4 or 5 conditions possible in the eastern eyewall of the storm. Bender sent PEP their contingency plan which was based on calculations made by their in-house architect, Bob Weibel. (Schieb Depo. p. 179). The calculations, which concerned the strength of the mooring against expected winds, were originally prepared for Hurricane Dennis, but the word Dennis was whited out. (Schieb Depo. pp. 180, 183). Bender added additional lines to the MHL and made other preparations to secure loose materials etc. (Scheib Depo. p. 250). Bender also contracted with Sea Bulk Towing to station a tug by the MHL and assist in keeping it secure (Scheib Depo. pp. 54, 152). A Coast Guard representative visited Bender's shipyard and viewed the moorings for the MHL and checked the lines against a drawing of a mooring plan for the MHL. (Barrow Depo. pp. 91-97; Holley Depo. p. 42-43). Between 8:00 and 8:15 a.m. on August 29, 2005, the tug captain decided it was unsafe to stay in place because of flying debris and left the MHL. (Busby Depo. pp. 46-50). The MHL with the CHEMUL on board broke loose from its moorings around 8:30 a.m. Monday morning, August 29, 2005. (Scheib Depo. p. 159).

## LEGAL ANALYSIS

**I. Bender's Objection to PEP's Joinder**

Bender objects to PEP's joinder based on unresolved discovery disputes regarding correspondence which Bender contends would show that PEP approved the mooring plan used during Hurricane Katrina. Bender argues that to the extent that PEP approved the mooring plan, it should be precluded from arguing and/or joining in non-PEP claimants' arguments that the plan was not appropriate. However, while it may not be in PEP's best interest to assert such arguments if PEP is found to have approved the plan the court sees no reason to preclude PEP from making such arguments.

**II. Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted: "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" Bailey v. Allgas, Inc., 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting Anderson, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, at 249-250. (internal citations omitted).

The basic issue before the court on a motion for summary judgment is "whether the

evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." See Anderson, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001). In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir.1999). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992) (citing Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 524 (11th Cir.1994)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)). Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party "may not rest on the mere allegations or denials of the [non-moving] party's pleading, but .... must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e)(2). "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 at 587 (1986) (internal quotation and citation omitted).

**III. Discussion**

Claimants seek summary judgment as to the issue of Bender's negligence and Bender's right to exoneration and limitation in this matter. More specifically, claimants assert that 1) Bender is negligent per se for failing to follow the Coast Guard's order to submit a hurricane plan, 2) Bender cannot overcome the presumption of negligence of the Louisiana rule, 3) Bender is not the owner of the barge and therefore has no right to limitation, and 4) Bender has no right to limitation because Bender's management had privity or knowledge of the negligence.

**A. Negligence Per Se**

Claimants argue that a failure to comply with a Coast Guard regulation is negligence per se. The Coast Guard ordered that vessels desiring to remain in port must submit a written request to the COTP with a mooring plan. Claimants argue that Bender failed to submit a written plan as ordered. However, the evidence regarding what plan, or portion of a plan, if any, was submitted is sketchy at best. Bender asserts that it did submit a plan on August 26, 2005.[1] There is testimony that a plan was faxed to the Coast Guard and that the plan was approved. (See Stokes Depo. p. 21; Stokes Affid.). There is also testimony that the only written plan at that time was the plan used for Hurricane Dennis - which entailed submerging the MHL. Yet Bender did not submerge the MHL. There is also testimony that a Coast Guard representative visited Bender's shipyard and viewed the moorings for the MHL and checked the lines against a drawing of a mooring plan for the MHL. The court is unable to determine as a matter of law whether Bender submitted a plan as required, or what that plan contained. The court finds there is sufficient evidence that Bender complied with the Coast Guard's order to preclude the application of negligence per se on summary judgment. Park v. Stockstill Boat Rentals, Inc., 492

[1] Bender's opposition also states that it was not required to submit a plan because the Coast Guard's Order only applied to vessels. However, Bender has offered no explanation or evidence to support an assertion that the MHL, under which Bender seeks limitation of liability, is not a vessel.

F.3d 600, 603 (5th Cir. 2007) ("In order to establish negligence per se, Park must show, as a threshold matter, that his employer violated a statute or Coast Guard regulation."(citations omitted)).

Even if Bender did not comply with the Coast Guard's order, negligence per se may not be applicable. "[T]here must be a causal connection between the injury alleged and the violation in order to establish negligence per se..." Florida Marine Transporters, Inc. v. Sanford, 255 Fed.Appx. 885, 888, 2007 WL 4180460, 2 (5th Cir. Nov. 27, 2007) (citing Park, 492 F.3d at 603 n. 2). The statutory violation must be a contributory and proximate cause of the accident.[2] In re Mid-South Towing Co., 418 F.3d 526, 534 (5th Cir. 2005). It does not appear that Bender's failure to submit a plan had any causal relationship to the incident. Perhaps if Bender had complied with the order and timely prepared a plan, the problems inherent in waiting until the last minute would not have arisen. In other words, if Bender had prepared earlier, it would have had time to safely submerge the MHL, which claimants argue would have adequately secured the MHL. However, claimants have not shown as a matter of law that submerging the MHL would have adequately secured the MHL, or even that Bender's plan at that time would have necessarily been to submerge the MHL. In fact, there is evidence indicating that Bender did submit a plan to submerge the MHL, but that it did not follow through with the plan or it later changed its plan. Moreover, Bender cites case law which holds that, for negligence per se to

[2] This is consistent with a similar rule called the "Pennsylvania rule." "Under the Pennsylvania rule, if a vessel is involved in a collision as a result of a statutory violation intended to prevent collisions, then the burden shifts to the 'vessel in derogation of a statutory rule' to show that this violation could not have been a cause of the accident. Florida Marine Transporters, supra (quoting In re Mid-South Towing Co., 418 F.3d 526, 534 (5th Cir. 2005)). "Such a rule is necessary to enforce obedience to the mandate of the statute." The Pennsylvania, 86 U.S. 125 (1873). This rule, commonly referred to as the "Pennsylvania rule," requires that the ship that violated the statutory rule have the burden of "showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been." Id. "[F]ault which produces liability must be a contributory and proximate cause of the collision, and not merely fault in the abstract." Board of Commissioners of Port of New Orleans v. M/V Farmsum, 574 F.2d 289, 297 (5th Cir. 1978).

apply, the order that was violated must establish a standard of care. See King v. Danek Medical, Inc., 37 S.W.3d 429, 460 (Tenn. Ct. App. 2000); Talley v. Danek Medical, Inc., 179 F.3d 154 (4th Cir. 1999); Atria v. Vanderbilt University, 142 Fed. Appx. 246 (6th Cir. 2005). Such cases hold that "[w]here a particular statutory requirement does not itself articulate a standard of care but rather requires only regulatory approval, or a license, or a report for the administration of a more general underlying standard, violation of that administrative requirement itself is not a breach of a standard of care." Talley, 179 F.3d at 159. While these cases are not maritime cases and are thus not controlling here, the court nevertheless finds them persuasive. Noncompliance with an order could not cause an accident where the order merely requires the submission of a plan, without specifying, even generally, some standard with which the plan must comply. Had the Coast Guard specified that vessels must submit a plan that would provide for the safety and security of the vessel against 75 mph or 140 mph winds, then Bender's violation of the order would more clearly have had a causal relationship with the damages incurred. Instead, the Coast Guard's order simply required an administrative filing. The court presumes that if the Coast Guard realized that Bender failed to submit a plan for the MHL or that Bender had submitted an inadequate plan, then the Coast Guard would have given Bender additional orders - such as to move the MHL out of port or to better prepare the MHL for the storm. The violation of such orders might constitute negligence per se. However, there has been no allegation that additional orders were made or violated by Bender.

**B. Louisiana Rule**

Under the Louisiana rule, when an unmoored, drifting vessel hits an anchored vessel or a structure, it is presumed to be at fault. See The LOUISIANA, 3 Wall. 164 (70 U.S.), 18 L.Ed. 85 (1865). Although Bender was not the owner of the MHL, Bender contends that it was the demise charterer of the MHL and it is clear that Bender was at least partially responsible for the

safety and maintenance of the MHL.[3] Thus, as one of the parties responsible for the MHL, Bender is presumed to be at fault under the Louisiana rule. This presumption is rebuttable through any one of three ways.

> The defendant can demonstrate: "[1] that the allision was the fault of the stationary object[;] [2] that the moving vessel acted with reasonable care[;] or [3] that the allision was an unavoidable accident." Freeport Marine Repair, 240 F.3d at 923. These three defenses might be analogized to the common law tort arguments of contributory negligence, denial of negligence, and superceding causation, respectively. Each independent argument, if sustained, is sufficient to defeat liability.

Fischer v. S/Y NERAIDA, 508 F.3d 586, 593 (11th Cir. 2007). There is no dispute that the stationary objects in this case were not at fault. However, the parties dispute whether reasonable care was taken and whether the incident was unavoidable.

This court recently entered an order in this action on the motion for partial summary judgment of Atlantic Marine, Inc. which addressed whether reasonable care was taken in preparing the MHL and CHEMUL for Hurricane Katrina and whether unforeseen intervening acts caused the incident. This court found then that there was a material issue of fact precluding summary judgment as to both reasonable care and unforeseen intervening acts. Notably, that finding was based on a view of the facts in the light most favorable to claimants, as the non-movants. Under the motion presently before the court, the facts must be viewed in the light most favorable to Bender. The court finds it unnecessary to delve into the facts and circumstances at length here and refers the parties to its previous discussion on these issues in the order entered on Atlantic Marine Inc.'s summary judgment motion. Although Bender has the hurdle of overcoming the presumption of fault,[4] the court finds that there is sufficient evidence to preclude

---

[3] As will be discussed later, claimants contend that the charter in question is not a demise charter and, therefore, that Bender has no right to limitation. However, Bender was at least partially responsible for the MHL and is therefore presumed to be at fault.

[4] In the absence of any evidence to the contrary, Bender's negligence would be presumed. However, Bender has presented evidence that it took reasonable care and that the conditions experienced were significantly worse than forecast. "Evidentiary presumptions ... are designed

a ruling in claimants' favor on summary judgment.

**C. Ownership Rights**

Claimants argue that Bender's claim to limitation should be denied because it is not an owner of the MHL. The Exoneration and Limitation of Liability Act provides that certain claims, debts or liabilities against the owner of a vessel "shall not exceed the value of the vessel and pending freight." 46 U.S.C. § 30505. "[T]he term 'owner' includes a charterer that mans, supplies, and navigates a vessel at the charterer's own expense or by the charterer's own procurement." 46 U.S. C. § 30501. Courts have consistently held that only a bareboat or demise charter is entitled to an exclusion or limitation of its liability. In re Anheuser-Busch, Inc., 742 F.Supp. 1143, 1145-1146 (S.D. Fla. 1990) (citing Guzman v. Pichirilo, 369 U.S. 698, 82 S.Ct. 1095, 8 L.Ed.2d 205 (1962); Bishop v. United States, 476 F.2d 977 (5th Cir.), cert. denied, 414 U.S. 911, 94 S.Ct. 234, 38 L.Ed.2d 149 (1973)). To create a bareboat or demise charter "the owner of a vessel must completely relinquish possession, command and navigation thereof to the charterer." Id. (citing Guzman, 369 U.S. at 699, 82 S.Ct. at 1096); see also Gaspard v. Diamond M. Drilling Co., 593 F.2d 605, 606 (5th Cir. 1979) ("A complete transfer of possession, command, and navigation of the vessel from the owner to the charterer is required in order to constitute a demise charter." (citations omitted)).[5]

In a previous order, this court found that Atlantic Marine, Inc. did not transfer complete custody and care of the MHL to Bender. (Doc. 434). This court explained as follows:

Although it is questionable whether merely having the right to inspect the MHL

---

to fill a factual vacuum. Once evidence is presented ... presumptions become superfluous because the parties have introduced evidence to dispel the mysteries that gave rise to the presumptions."
In re Mid-South Towing Co., 418 F.3d 526, 531 -532 (5th Cir. 2005) (quoting Rodi Yachts, Inc. v. National Marine, Inc., 984 F.2d 880, 887 (7th Cir. 1993)).

[5] Decisions of the Former Fifth Circuit filed prior to October 1, 1981, constitute binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

> would constitute a retention of custody and care, it is clear that Atlantic Marine did more than that here. Atlantic Marine monitored the MHL daily and made adjustments to the drafts whenever it deemed appropriate. Atlantic Marine was by all accounts the "operator" of the MHL. Bender was, in fact, prohibited from operating the MHL itself.

(Doc. 434, pp. 9-10). However, this court's previous finding was based on the facts viewed in the light most favorable to claimants as the non-moving parties in that instance. "An owner's unlimited access to the chartered vessel and ultimate control over the chartered vessel's operation are indicia that a conveyance is not a bareboat or demise charter." Gatewood v. Atlantic Sounding Co., Inc., 2007 WL 1526656, 6 (M.D. Fla. 2007) (citing Lovette v. Happy Hooker II, No. 2:04CV522FTM29SPC, 2006 WL 66722, * 4 (M.D. Fla. 2006); Birmingham Southeast, LLC v. M/V MERCHANT PATRIOT, 124 F.Supp.2d, 1327, 1338-39 (S.D. Ga. 2000)). However, construing the facts in the light most favorable to Bender, as the non-movant, the court finds there is a material issue of fact as to Bender's status as an owner.

**D. Privity & Knowledge**

Claimants argue that even if Bender was a proper party for limitation, it is not entitled to limitation because its negligence was infused with the knowledge and privity of management. An owner is entitled to limitation of liability only if it the loss "was done, occasioned or incurred, without the privity or knowledge of such owner or owners." 46 U.S.C. §30505(b). Where the owner of a ship is a corporation, the corporation is not entitled to limit its liability "where the negligence is that of an executive officer, manager or superintendent whose scope of authority includes supervision over the phase of the business out of which the loss or injury occurred." Coryell v. Phipps, 317 U.S. 406, 410, 63 S.Ct. 291, 87 L.Ed. 363 (1943). Whether Bender had privity or knowledge is not measured against every fact or act regarding the accident; rather, its privity or knowledge is measured against the specific acts or unseaworthy conditions that actually caused or contributed to the accident. Suzuki of Orange Park, Inc. v. Shubert, 86 F.3d 1060, 1065 (11th Cir. 1996) (citations omitted). "The burden of proving negligence lies on the person claiming to be injured, but once negligence is established, the

vessel's owner must prove lack of knowledge or privity to the negligence." Clinton River Cruise Co. v. DeLaCruz, 213 Fed.Appx. 428, 430, 2007 WL 98153, 2 (6th Cir. Jan. 10, 2007). It is difficult to assess privity or knowledge when the specific acts of negligence, if any, have not yet been conclusively established. In fact, at least one court has held that "a shipowner is entitled to a limitation of liability when the claimant has failed to make any particular showing as to the cause of loss." Washington State Dept. of Transp. v. Sea Coast Towing Inc., 148 Fed.Appx. 612, 614, 2005 WL 2129642, 2 (9th Cir. 2005) (citing In re BOWFIN M/V, 339 F.3d 1137, 1138 (9th Cir. 2003) (per curiam)). Since negligence has not yet been established, the court finds it premature to determine on summary judgment whether Bender had privity and knowledge of the negligence.

## CONCLUSION

For the reasons stated above, claimants' motion for partial summary judgment (Docs. 355, 356) is **DENIED**.

**DONE** and **ORDERED** this 19th day of August, 2008.

/s/ Callie V. S. Granade
CHIEF UNITED STATES DISTRICT JUDGE